# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00510-CV

**M. R., C. B., and J. R., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY,**
**NO. D-1-FM-12-006898, THE HONORABLE JAN SOIFER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Three appellants challenge the trial court's final order terminating their respective parental rights to four children after a bench trial. Appellant Julie is the mother of all four children—Rose, John, Allen, and Jim, who at the time of trial were ages fifteen, seven, six, and four, respectively.[1] Appellant Matthew is the father of Rose; Appellant Connor is Julie's current husband and the father of John, Allen, and Jim. The Texas Department of Family and Protective Services (Department) removed all four children from Julie and Connor's home after it received referrals alleging that the home was unsafe and that Julie and Connor were using drugs and fighting about drugs in front of the children. On appeal, Julie, Connor, and Matthew argue that the evidence was legally and factually insufficient to support the trial court's endangerment and best-interest findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (b)(2). Julie also argues that Rose's

---

[1] To protect the children's privacy, we refer to the children and their parents by pseudonyms and to other persons by their relationship to the children. *See* Tex. R. App. P. 9.8.

in-chambers statements were insufficient to support a finding of endangerment and that the termination of Julie's parental rights to Rose was not supported by the live pleadings.[2] We affirm the trial court's decree of termination.

**History of the Department's Intervention**

This case is the family's third with the Department. In 2015, the Department received a referral alleging physical abuse and neglectful supervision for then seven-year-old Rose and her fourteen-year-old brother Sam (who are both children of Julie and Matthew; Sam is now an adult). Rose and Sam made outcries of domestic violence between Julie and Connor and Sam outcried that Connor threatened to hurt him on several occasions. In May 2016, the trial court entered an agreed final decree of conservatorship for fifteen-year-old Sam, stating that it would not be in Sam's best interest to appoint Julie or Matthew as his sole managing conservator because doing so would significantly impair Sam's physical health or emotional development. The trial court designated Sam's maternal relatives as joint managing conservators who retained the exclusive right to designate Sam's primary residence, among other responsibilities.[3] A month later, the trial court issued a separate final decree stating that Julie and Matthew remained joint managing conservators of then eight-year-old Rose.

Based on allegations of drug abuse and domestic violence, the Department moved in May 2017 to modify the final decree pertaining to Rose by removing Julie and Matthew as joint

---

[2] Julie and Connor filed a joint brief on appeal but only Julie has standing to assert claims concerning Rose. *See Grassroots Leadership, Inc. v. Texas Dep't of Fam. & Protective Servs.*, 646 S.W.3d 815, 819 (Tex. 2022) (instructing that plaintiffs have standing when they allege concrete personal injury traceable to defendant's conduct and request relief likely to redress injury).

[3] The disposition for the case was reason to believe there was physical abuse of Sam by Connor and reason to believe for neglectful supervision of Rose and Sam by Julie and Connor.

managing conservators. The Department also requested that the trial court terminate the parental rights of Julie and Connor to their two sons, then eighteen-month-old John and six-month-old Allen.[4] In the affidavit in support of extraordinary relief signed in May 2017, Department investigator Marleen Martinez swore that Maternal Aunt reported in April 2017 that Julie was acting "either mentally ill or intoxicated" and Maternal Aunt believed that Julie and Connor were addicted to prescription medications and were using various emergency rooms to support their habit. Martinez averred that Julie denied the allegations but admitted to using prescription pain medication to treat medical issues. Julie refused to take an oral swab or urinalysis drug test and did not timely submit to a requested hair follicle drug test. Connor's drug test was positive for codeine and Martinez was not able to contact Connor. Rose disclosed to Martinez that Julie and Connor "fight and yell at each other."

Martinez also swore in the affidavit that Paternal Grandfather told a Department supervisor in April 2017 that Julie and Connor were abusing prescription drugs and their home was unsanitary to the point of being harmful to the children. In May 2017, Maternal Aunt reported that Julie admitted to snorting prescription pain medication and that domestic violence continued between Julie and Connor. Maternal Aunt also reported that Rose disclosed that Rose was scared to live with Julie because of violence in the home. Another relative reported witnessing an altercation between Julie and Connor that occurred when the children were present in the home. Martinez averred that Julie refused to complete an outreach, screening, assessment, and referral (OSAR) or a voluntary Parent Child Safety Placement.

_____

[4] The Department's second case did not involve Jim or Sam. At this time, Sam continued to reside with maternal relatives pursuant to the trial court's final decree of conservatorship entered in 2016. Jim was not born until after the trial court dismissed the Department's second case.

3

Paternal Grandparents filed a petition to intervene in the lawsuit that requested the trial court terminate the parental rights between the biological parents and the children. The trial court entered agreed temporary orders in June 2017 that awarded the Department temporary managing conservator for the children.[5] In December 2017, the Department received a referral alleging that Matthew touched Rose in a sexually inappropriate way and Rose was removed from Matthew's care. It appeared that the Department subsequently ruled out that allegation.

In February 2018, the trial court ordered the monitored return of John and Allen to Julie and Connor and also ordered that Intervenors (Paternal Grandparents) have continued weekly overnight visitation with John and Allen. A month later, Julie was appointed as sole managing conservator of Rose with the exclusive right to designate Rose's primary residence, and Matthew was named possessory conservator of Rose with no possession or access. The trial court dismissed the Department's petition without prejudice in May 2018.

In January 2021 the Department received a referral alleging neglectful supervision of Rose, John, Allen, and Jim by Julie and Connor.[6] The referral alleged that Julie and Connor appeared to be under the influence of drugs, had sores on their body and had lost significant weight, and left the children unsupervised for extended periods of time.

The Department received a second referral in March 2021 that alleged neglectful supervision of Rose, John, Allen, and Jim, by Julie and Connor. The referral alleged that Maternal Aunt called law enforcement because Julie and Connor argued in front of the children when Connor accused Julie of stealing his methamphetamine and Connor slapped Julie.

---

[5] The trial court awarded Julie and Connor supervised visitation with their children and Matthew unsupervised visitation with Rose.

[6] Sam was twenty years-old at this time.

4

Julie would not permit a Department investigator into her home on January 24, 2021. Rose was visibly upset when she was brought outside of Julie's home, but Rose nodded when she was asked if she was safe. The children were removed and placed with family members pursuant to a safety plan. John and Allen were placed with Paternal Grandparents. Jim was initially placed with Maternal Grandparents and later placed with Foster Parents. Rose was initially placed with Maternal Aunt and later placed with Sam and a cousin. In February 2021 the Department received drug-test results for Julie and Connor that were both positive for marijuana. On March 3, 2021, a Department investigator responded after Julie removed her children from their placement in violation of the safety plan. On March 11, 2021, the Department received drug test results reflecting that Julie was positive for methamphetamine and marijuana and Connor was positive for marijuana.

On March 29, 2021, a Department investigator discovered that Julie and Connor were living in the same household as Jim in violation of the safety plan. A department investigator conducted a family team meeting that day, noting concerns for multiple cases with the family involving drug use and domestic violence, and a recent case involving gun violence with the children in the car for which Connor was arrested.[7] The Department received drug test results for Julie and Connor on April 3, 2021, that reflected both Julie and Connor's levels of marijuana had increased since they were first tested in January 2021. On April 6, 2021, Julie and Connor both admitted to a Department investigator that they smoked marijuana daily and parented their children while under the influence of drugs. Julie admitted to slapping Connor "a few times out of anger" but claimed this was due to anxiety medication.

---

[7] The record reflects that there also was a report that Connor pointed a gun a Rose and was physically aggressive with her.

In April 2021, the Department filed a petition to terminate (i) Julie's parental rights to all the children; (ii) Connor's parental rights to John, Allen, and Jim; (iii) and Matthew's parental rights to Rose. The Department alleged that Julie, Connor, and Matthew (i) knowingly placed or allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (ii) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; and (iii) that termination of the parent-child relationship was in the best interest of the children. *See id.*

A family plan filed with the trial court in June 2021 reported that Rose's general practitioner diagnosed Rose with severe depression and prescribed the thirteen-year-old anti-depressants. Rose described herself as depressed and disclosed thoughts of death but without a plan for self-harm. Rose attributed her depression to her experiences with Julie and Connor, and Rose did not feel safe in Julie and Connor's home. Rose also had not attended school for several months. She was referred to therapy to address her family history and depression. The family plan noted that Rose felt happy, safe, and supported living with Sam and another relative. Rose did not want to return to Julie and Connor's home or have visits with them. The family plan described four-year-old Allen as having developmental and speech delays and noted that he was not potty-trained.

The family plan noted that rent payments on Julie and Connor's apartment were past due by at least six months and the children reported going without food at times. The plan documented mutual violence in Julie and Connor's relationship that included "slapping, hitting, and verbal threats that the children have witnessed." The family plan reported that Julie was diagnosed with adjustment disorder in 2017 and Connor was hospitalized and diagnosed with

6

bipolar disorder in 2013 but no longer took his prescribed psychiatric medication. It was revealed during trial that Rose attempted suicide and was hospitalized in 2022. She was released from the hospital into the care of Sam.

A bench trial occurred November 14, 2022, and July 17 through July 20, 2023. Intervenors, attorneys ad litem, and guardians ad litem requested termination of parents' rights at trial but the Department did not.[8] After the conclusion of trial, the court assigned the final decree terminating the parental rights of Julie, Connor, and Matthew to their respective children. In the final decree, the trial court found by clear and convincing evidence that each parent (i) knowingly placed or knowingly allowed their child or children to remain in conditions or surroundings which endangered the physical or emotional well-being of the child or children; (ii) engaged in conduct or knowingly placed the child or children with persons who engaged in conduct which endangered the physical or emotional well-being of the child or children; and (iii) that it was in the best interest of the child or children to terminate the parent-child relationship. *See id*. The trial court appointed Sam as the nonparent sole managing conservator for Rose and the Department as the sole nonparent managing conservator of John, Allen, and Jim. Each parent has appealed.

**Summary of Relevant Evidence at Trial**

Maternal Aunt testified at trial that shortly before the Department reopened the case in 2021 she called law enforcement because she witnessed Julie and Connor arguing about pills in front of the children. Maternal Aunt went to Julie and Connor's home and saw "poop on the floor and smeared in the living room" and "the sink was clogged and very, very gross." She described seeing "one of the kids pick up a Froot Loop that was kind of stuck to the floor off of the floor and

---

[8] The Department requested that Rose remain in her placement with Sam and that Sam be awarded managing conservatorship. Neither Julie or Matthew requested that Rose be returned to their care.

eat it." Maternal Aunt testified that there was no food in Julie and Connor's house and Rose was always hungry.

Jim and Rose were placed with Maternal Aunt in March 2021. Maternal Aunt described that, shortly after being removed from his parents, two-year-old Jim mimed the act of tying something around Maternal Aunt's arm, pinching her arm, and sticking a needle in it. Maternal Aunt described witnessing Julie using drugs during the Department's case and stated that Julie admitted to snorting painkillers and using marijuana.

Department investigator Christine Liguez testified that Julie and Connor admitted to parenting under the influence of drugs, Julie admitted to slapping Connor, and that after Connor told Liguez that he stopped smoking marijuana, both Connor and Julie's drug tests reported higher levels of marijuana. Liguez stated that Connor and Julie provided positive drug tests when they were living with Jim in violation of the parent-child safety plan.

Liguez testified that Maternal Grandfather provided the Department with photographs of Julie and Connor's home that depicted a toilet backed up with "a lot of feces and stuff in it," including cigarette butts. Another photograph showed "trash and stuff in the bathroom." Rose disclosed to Liguez that Rose felt unsafe living with Julie and Connor. Liguez found Rose to be credible. Liguez noted that this family had two prior cases involving allegations of drug abuse, neglectful supervision, and domestic abuse where the parents worked court-ordered services in 2015 and 2017 and the Department had temporary managing conservatorship of the children.

Jim was placed with Foster Parents in April 2022 when he was three years old. Foster Mother testified that Jim had a fifteen-word vocabulary at that time, and eight of those words consisted of planets in the solar system. Foster Mother stated that a speech therapist

8

assessed Jim as being in the fifth percentile when compared to his peers in terms of language ability. After nine months of speech therapy and daily homework, Jim caught up with his peers, although Foster Mother still helped Jim with back-and-forth communication.

Foster Mother testified that Jim was also physically delayed when he was placed. Jim could not walk like his peers and needed constant handholding so he would not trip. Foster Mother explained that at the playground, Jim could not cross the bridge or go up the stairs and down the slide like other three-year-olds. She stated that soccer and daily backyard play bridged the gap with Jim's delay in mobility. Jim also had severe breathing issues which were diagnosed as asthma and treated.

Foster Mother testified that Jim returned from visits with his parents emotionally dysregulated. Jim communicated to Foster Mother that he did not feel safe during parent visits and reported that his brothers hit him. Foster Mother testified that this aggressive behavior was unique to parent visits because Jim's siblings were well-behaved when they visited Foster Mother's home on July 4. The Department told Foster Mother that Jim's parent visits were cut short because of "safety concerns" and Foster Mother had to pick Jim up early from more than half of his parent visits in 2023. Foster Mother and Father are licensed to adopt and are willing to adopt Jim.[9]

John and Allen were placed with Intervenors Paternal Grandparents at the time of trial. Paternal Grandfather testified that Connor had been hospitalized for psychiatric needs three times, with the first occurring in 2012. When Connor moved to Austin in 2015, the Department got involved after Connor began dating Julie. A Department investigator telephoned Paternal Grandfather asking him to take Rose and Sam because the investigator said that either Connor or

---

[9] Foster Mother testified that she and her husband have a good relationship with Paternal Grandparents, where Jim's siblings were placed. Foster Mother stated that if she and her husband adopt Jim, her family would maintain a safe bond with Jim's biological family.

the children needed to leave Julie's home and Julie wanted the children to leave. Paternal Grandfather declined because he was helping Connor "with his mental disorders."

Paternal Grandfather testified that he also had concerns about Julie's mental health. Julie accused Paternal Grandparents of being members of a drug cartel and repeatedly demanded that Paternal Grandparents drug test, and Julie called in multiple unfounded wellness checks on Paternal Grandparents.[10] Paternal Grandfather explained that Julie and Connor believed that both theirs and the children's electronic tablets and cellular phones were hacked and that they were being spied on, so the family changed phones frequently. Paternal Grandfather explained that it was easy to "see the signs" of paranoia related to drug abuse with Julie and Connor, such as "doors being removed," because "[d]rug users don't trust each other."[11]

Connor told Paternal Grandfather that he carried a concealed firearm because "people were following them and casing their house[.]" Paternal Grandfather testified that after Connor was arrested for assault, Julie called Paternal Grandfather asking if she and Connor could store their guns at Paternal Grandfather's home because "they were afraid of a CPS case being originated." Connor also told Paternal Grandfather that he was a hit man for the Bloods street gang.

The trial court admitted a photograph of Julie and Connor's bedroom that Paternal Grandfather testified depicted a Glock carrying case lying unsecured on top of an armoire. The trial court admitted additional photographs that Paternal Grandfather took of Connor and Julie's

---

[10] Paternal Grandfather testified that John and Allen were immediately placed with him when the children were removed from Julie and Connor during the Department's second case in 2017. Paternal Grandparents thereafter drug tested because Julie repeatedly requested it.

[11] Paternal Grandfather testified that when he was inside Julie and Connor's apartment the master bedroom door was removed.

apartment before the Department opened the second case.  The photographs depict bedrooms that could not be walked through because items covered the floors and beds.  The photographs also show a bathroom containing a soiled bathtub filled with diaper boxes and an unflushed toilet filled with feces and other items.

Paternal Grandfather explained that when he picked the boys up for visits after the second case:

> They needed baths.  They needed clean clothes. . . . [P]rior to the case number three . . . everything they brought from the apartment had this disgustingly weird odor. And instead of trying to wash them or whatever, we just threw them in the trash.

Paternal Grandfather took a photograph in February 2021 to show "[j]ust . . . how filthy [Allen] was.  He hadn't been bathed in days.  His hair was filthy.  His clothes were filthy.  Again, they had this horrendous odor[.]"  Four-year-old Allen was placed with Paternal Grandfather in February 2021 not potty-trained and wearing his two-year-old brother's diapers.  Paternal Grandparents potty-trained Allen within ten days.[12]  Paternal Grandfather did not believe that Julie and Connor could be successful parents because they were not honest with the service providers and they telephoned their sons fewer than five times.

Paternal Grandparents are licensed to adopt and planned to adopt John and Allen.[13] Paternal Grandparents would see that John and Allen continue with therapy and are educated, safe, and cared for.  Paternal Grandfather planned for the children's school and a relative has a farm with activities for the boys.  The siblings would attend sports camp and use the family boat,

---

[12]  Paternal Grandparents enrolled John and Allen in speech therapy in 2021.  The boys also required a therapist to deal with the trauma they endured.

[13]  Paternal Grandfather testified that he is a "full-time granddaddy" and he planned for John and Allen to live with him for eternity.

swimming pool, and basketball goal. Jim's foster family lives nearby and the families visit for holidays and occasions. Paternal Grandfather explained that Rose's relationship with John and Allen has blossomed since Paternal Grandparents organized visits between the siblings.

Tanyika Johnson, a human services technician for the Department, testified that she observed Julie and Connor's parent-child visits with John, Allen, and Jim. Johnson testified that during the visits, Allen and John would use foul language, curse at their parents, spit, and physically fight with their siblings and parents. Visits had to be cut short because of the "fighting and getting out of control."[14] Johnson described that one child locked Julie in a restroom at the park and another child urinated on his brother in front of the parents. Johnson noticed that Jim did not want to hold Julie's or Connor's hand or be held.

The trial court appointed two guardians ad litem, who were also court-appointed special advocate (CASA) volunteers, to share the role of representing the interests of Rose, John, Allen, and Jim. Both guardians ad litem believed that termination of parents' rights was in the children's best interest. First Guardian ad Litem testified that Connor did not appropriately engage with his children during parent-child visits and Julie depended on bribery by offering screentime with her cellular phone or treats. First Guardian ad Litem stated that the parents also refused to acknowledge or address the accusations of sexual abuse, sexual misconduct, and domestic violence, while the guardians ad litem witnessed the accounts of the children and behavior from the children responding to that. First Guardian ad Litem explained that during the past two years, the children saw therapists and received diagnoses and explanations for their behaviors, which revealed that more had happened than what Julie and Connor acknowledged. First Guardian ad

---

[14] Johnson testified that Julie and Connor requested for their parent-child visits to be cut short.

Litem testified that the children expressed that they did not want to visit or live with their parents and expressed that they wanted to stay in their placements where they felt safe and attached to their caretakers.

Both guardians ad litem testified that it was in Rose's best interest to remain in her placement with Sam. When First Guardian ad Litem met Rose, she was withdrawn and anxious and was not attending school. Rose overdosed on pills and was hospitalized in March 2022 because she was depressed and was not receiving services. Rose was released from the hospital to a placement with Sam under the terms of a safety plan. First Guardian ad Litem testified that under Sam's supervision, Rose built a support system and gained friends, and her recent grades were A's and B's. Rose became happy, healthy, and proud of her accomplishments. First Guardian ad Litem testified that Rose was "very desperate in her plea" to not live with Julie and Connor and wanted to live with Sam.

First Guardian ad Litem testified that John and Allen were thriving in their placement with Paternal Grandparents. John and Allen were happy, healthy, and engaged in multiple hobbies. The siblings formed a great bond with each other and love for Paternal Grandparents. First Guardian ad Litem testified that Paternal Grandparents have ensured that John and Allen's physical and mental health needs were met.

Second Guardian ad Litem stated that although the parents tested positive for illegal substances throughout the case, they denied their use of drugs or problem with drugs. Second Guardian ad Litem was concerned about domestic violence and the parents' inability to keep the children safe and failure to acknowledge sexual abuse. Second Guardian ad Litem reported concerns of sexual abuse based upon allegations from the children. She believed that Rose was

sexually abused based upon Rose's outcry and Rose's body insecurities.[15] According to Second Guardian ad Litem, Rose outcried that she was sexually assaulted by Connor, that Julie and Connor had sex in front of the boys, and that Connor and Julie bathed together with the boys inappropriately. Second Guardian ad Litem reported that all three boys had issues with bathing and that Jim experienced discomfort with water and having his diaper changed.[16] Second Guardian ad Litem stated that Rose outcried that Matthew sexually abused her in 2017. To the best of her knowledge, the Department investigated and ruled out the allegation.

Second Guardian ad Litem believed that the parents had not learned about their children's needs or how to address them. Second Guardian ad Litem testified that Jim was mostly babbling the first time she saw him in June 2021. Jim did not learn new words during his initial placement with Maternal Grandparents and it was not clear that Jim understood what "yes" and "no" meant. Although speech therapy was recommended for Allen and Jim at the beginning of the case, Julie did not believe her sons needed it. After Jim was placed with Foster Parents and received speech therapy, he asked many questions and became interested.

Sherell Stevenson, the Department caseworker assigned to the case in March 2023, testified that Connor had not completed the Batterer's Intervention Prevention Program as ordered, neither Julie or Connor had been successfully discharged from individual therapy, and the parents had not completed family therapy or couple's therapy. Stevenson testified that Julie's last positive

---

[15] Second Guardian ad Litem testified that she shared information about Rose's outcry with the Department, her co-CASA, and her supervisor.

[16] Second Guardian ad Litem testified that Allen would frequently get on all fours, pull down his pants, and slap his own butt, and that John demonstrated the same behavior. Although Second Guardian ad Litem testified that "we've had concerns about [this behavior] throughout the case in regards to sexual abuse," she acknowledged that Allen may perform this behavior "sort of for attention at this point."

14

drug test was in December 2022, which was positive for marijuana. Julie also tested positive for heroin in February 2022. Stevenson considered December 2021 as the date of Connor's last positive drug test.[17]

Stevenson testified that Connor and Julie claimed that the Department opened the current case because Rose "made up lies" and because of Connor's drug use. Stevenson agreed that Rose's needs were met in her current placement with Sam and stated that the Department did not want to change Rose's placement. She stated that at Rose's discretion Rose had no contact with Julie or Matthew. Stevenson also testified that John, Allen, and Jim's needs were met in their current placements and the siblings were bonded. Stevenson testified that Julie and Connor voluntarily shortened their parent-child visits and never requested expanded visits. Stevenson stated that Julie and Connor requested that Paternal Grandparents be drug tested on multiple occasions, and none of those drug tests returned positive for any substance.

Although Stevenson testified that the Department did not want to terminate the parents' rights, she underscored the neglect that the siblings experienced. Stevenson was concerned that John and Allen both had more than five cavities when they came into the Department's care in 2021 and that John needed two crowns and at least two root canals. Stevenson testified that she had not spoken to Julie or Connor about their plan for meeting the boys' medical or dental needs if the children were returned. Stevenson had not spoken to Julie or Connor about where the children would attend school or daycare. When Stevenson visited Julie and Connor's home the bedrooms and bathroom had no doors. Stevenson also expressed a safety

---

[17] Stevenson did not consider Connor to have provided positive drug tests in 2022 because Connor had prescriptions for the pain medications for which he tested positive for that year. Stevenson acknowledged that Connor's alleged use of prescription medication was one of the concerns that initiated the Department's second case in 2017.

15

concern for Jim's asthma because Maternal Grandfather who lived with Julie and Connor smokes cigarettes.[18]

Tina Nunnellee, a licensed counselor who worked with Julie and Connor since November 2021 regarding the Department's case, testified that Julie and Connor started off using drugs in the beginning of the case and both parents later relapsed.[19]  Dr. Nunnellee recalled that Connor told her that he went to many doctors and obtained a prescription for codeine around July 2022.  She could not verify that Julie and Connor were currently engaged in formal recovery programs.  Dr. Nunnellee testified that Julie and Connor never admitted that they placed their children at risk.  Dr. Nunnellee was aware that Connor was placed on probation during the pendency of the Department's case because he was arrested and criminally prosecuted.  Despite these factors, she testified that Julie and Connor were "committed to themselves, their sobriety, and their children," and she expected the parents to be in the return and monitor process.

Julie requested the court return John, Allen, and Jim to her and Connor.  She testified that she lived with Connor and Maternal Grandfather in a three-bedroom apartment on a month-to-month lease.[20]  Julie could not name the specific school that her sons would attend, which doctors her sons would see, or what health insurance plan would cover her sons if they were returned to her care, other than that she had health insurance through her job.  Julie testified that

---

[18] Parenting coach Alecia Little also testified that Julie and Connor's apartment smelled of cigarette smoke and stated that Julie and Connor did not have beds for the children.

[19] Dr. Nunnellee testified that Julie relapsed before she reached six months of sobriety. Dr. Nunnellee qualified that she was not certain if Connor experienced "true relapse" or if he tested positive for opium because of "the drugs that the doctor gave him."  Julie and Connor did not disclose to Dr. Nunnellee that they purchased and used heroin together and Connor did not disclose the number of times he was hospitalized for mental health reasons.  Dr. Nunnellee did not know what medications Julie and Connor were currently taking.

[20] Julie testified that she married Connor in 2021.

she cut her parent visits short because she had "other obligations." Julie acknowledged that Paternal Grandparents sometimes paid her rent.

Julie believed that the Department opened this case because she was addicted to "marijuana and no other substances." She acknowledged that she tested positive for methamphetamine and that she and Connor "dabbled" in heroin around December 2021. Julie described that Connor was with her when she purchased and smoked heroin, and she explained how they melted the heroin on aluminum foil and inhaled the narcotic with a straw. Julie argued that she did not "relapse" on heroin in December 2021 because she was not addicted to the drug. Julie testified that this third case would turn out differently than the Department's prior two cases because she realized that she is a marijuana addict, she had a job, and Connor was "no longer on pain management." Julie could not identify her exact sobriety date but acknowledged that she used marijuana in December 2022. She did not attend AA or NA.

Connor testified that he was placed on deferred adjudication community supervision after he was charged with aggravated assault for pulling a Glock on a man in a gas station in 2021. Connor said that Julie and the children were with him when he pulled the firearm and got arrested. Connor testified that the children said that he "did nothing wrong" and the person Connor pulled the gun on "was a maniac."

Connor admitted that he smoked marijuana in the home when Rose was present. Connor also admitted that he and Julie used heroin in December 2021 and did not report this to the Department.[21] He also used heroin alone without Julie. Connor took suboxone and kratom to alleviate his withdrawal symptoms from heroin. He obtained three prescriptions for codeine in the

---

[21] Connor was on probation when he used heroin and did not inform his probation officer of this illegal drug use.

17

last eighteen months. Connor saw ten medical doctors in 2017 to obtain prescriptions for pain medications.

Connor believed that the diagnosis he received of bipolar disorder was a false diagnosis. Connor did not believe it was appropriate that Paternal Grandparents had him hospitalized at least three times for mental health issues, although he "could've been dealing with depression or something." Connor agreed that law enforcement was previously called out of concerns for his mental health, and he was "not really aware of that time" when he broke into Julie's home in 2015 and messed up Sam's room.

Connor did not know what medical doctors or therapists would treat his sons if his children were returned to his care. Connor had not made plans to meet his sons' medical needs if his children were returned to his care and testified that he did not know what his children's medical needs were. He had no plan for sports or hobbies for his sons if the children were returned. Connor agreed that Rose spent all her time in her room when she lived with him.

## APPLICABLE LAW AND ANALYSIS

To terminate parental rights, the Department has the burden to prove by clear and convincing evidence (1) one of the statutory-predicate grounds and (2) that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1)–(2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *see In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

18

In conducting a legal-sufficiency review in parental-termination cases, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Reviewing the legal sufficiency of the evidence used to support a termination requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Id.* In reviewing the factual-sufficiency of the evidence under the clear-and-convincing standard, we "weigh[] disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

When reviewing the evidence, we must give deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006); *see In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (instructing that appellate courts reviewing termination orders must defer to factfinder "who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing credibility and demeanor of witnesses").

**Endangerment Findings**

Julie, Connor, and Matthew challenge the legal and factual sufficiency of the evidence to support the trial court's predicate findings under subsections (D) and (E)—that (i) they knowingly placed or knowingly allowed their child to remain in conditions or surroundings which endangered their child's physical or emotional well-being, and (ii) engaged in conduct or

19

knowingly placed their child with persons who engaged in conduct which endangered the child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one predicate ground is necessary to support termination of parental rights but requiring appellate court to detail analysis in appeal challenging subsection (D) or (E) finding because of due process concerns).

Both subsection (D) and subsection (E) require proof of endangerment, which in this context means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone,' and courts may look to conduct 'before the child's birth and both before and after the child has been removed by the Department.'" *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 253 (Tex. App.—Austin 2022, pet. denied) (quoting *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.)). "[I]t is not necessary that the conduct be directed at the child or that the child actually suffers injury." *M.C.*, 917 S.W.2d at 269. "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *S.B.*, 654 S.W.3d at 253.

The relevant inquiry under subsection (E) is whether the evidence shows that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth, 2011, pet. denied). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary,

deliberate, and conscious course of conduct by the parent." *Id.* In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *Id.* "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.) (internal quotation marks omitted). Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *see also In re M.Y.G.*, 423 S.W.3d 504, 510 (Tex. App.—Amarillo 2014, no pet.).

**Discussion–Julie and Connor**

Julie and Connor argue that the evidence fails to support a finding that the children's living conditions endangered them and that marijuana use is an insufficient reason for terminating parent's rights. The evidence demonstrates that Connor and Julie have a history of drug use that continued during the pendency of this case. Connor tested positive for marijuana in March, April, July, and October 2021. He tested positive for heroin and morphine in October and December 2021, and he tested positive for methamphetamine in December 2021. Connor used heroin after he completed a protective parenting class, and he used heroin alone and with Julie. He also saw ten medical doctors in 2017 for "pain management."[22]

---

[22] Connor tested positive for codeine in August 2022, although he had a prescription.

21

Julie tested positive for marijuana in March, April, May, July 2021 and December 2022. Julie tested positive for amphetamine and methamphetamine in March 2021. She tested positive for heroin in February 2022.

Connor and Julie both admitted that they smoked marijuana daily and parented their children while under the influence of drugs. Connor admitted that he exposed Rose to his drug use by smoking marijuana in the home when she was present. During the time that Julie and Connor were living with Jim in violation of the safety plan in April 2021, their drug test results reported increased levels of marijuana from when they were first tested in January 2021.

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Illegal drug use exposes the child to the possibility that the parent may be impaired or imprisoned, which would endanger the child's physical and emotional well-being. *See A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (explaining that parent's illegal drug use may constitute endangerment under subsection (E)). A parent's decision to use illegal drugs while the termination suit is pending, and the parent knows he is at risk of losing his child, may support a finding of endangerment under subsection (E). *D.H. v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 62 (Tex. App.—Austin 2021, no pet.); *see, e.g., In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (explaining that evidence of parent's illegal drug use during pendency of termination suit, when parent is at risk of losing child, may support finding of endangerment under subsection (E)); *M.E.-M.N.*, 342 S.W.3d at 263 (same). Julie and Connor not only used illegal drugs during the pendency of a termination suit, they provided positive drug tests during the Department's third intervention with the family in seven years. From this evidence, the trial court could have formed a firm belief that Julie and

Connor's history of drug use and continued drug use during the pendency of this case, combined with other evidence showing the effect of their continued drug use on their parenting abilities, constituted conduct that endangered the children's physical and emotional well-being. *See D.H.*, 652 S.W.3d at 62; *J.O.A.* 283 S.W.3d at 345.

The evidence also reflects that Connor pulled a gun on another person in front of his children sometime around 2021 and was charged with assault because of the incident. Connor stated that Julie was with him at the time of the offense and Connor showed no remorse for his actions or arrest. The trial court could have reasonably concluded that Connor and Julie endangered their children by placing them in a dangerous situation and putting Connor in a position to be taken into custody. *See In re R.A.G.*, 545 S.W.3d 645, 651 (Tex. App.—El Paso 2017, no pet.) (explaining parent's criminal conduct may support endangerment under subsection (E) because it exposes child to possibility that parent may be incarcerated); *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (same). "[A]busive and violent criminal conduct by a parent can also produce an environment that endangers a child's well-being, and evidence that a person has engaged in such in the past permits an inference that the person will continue violent behavior in the future." *In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). The record also contained evidence that Connor shot himself, broke into Julie's home, and that Julie asked Paternal Grandfather to hold Connor's weapons in case the Department opened a case. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (explaining that want of self-control and propensity toward violence constitute evidence of endangerment).

Although Connor knew that he was diagnosed with bipolar disorder and had been hospitalized, he was not taking his prescribed medication. Julie described that the Department got

23

involved in 2015 after Connor had a "psychotic break," broke into her home, and "busted up" Sam's room. The trial court could have considered Connor's mental illness, its effects on his behavior, and his failure to address it as some evidence of endangerment. *See S.R.*, 452 S.W.3d at 363 (explaining that mental illness alone is not grounds for terminating parent-child relationship but untreated mental illness can expose child to endangerment and is factor court may consider).

Julie and Connor knowingly allowed their children to reside in dangerous conditions with no working toilet, a lack of food, and unsanitary conditions. *See In re J.R.*, 501 S.W.3d 738, 743–44 (Tex. App.—Waco 2016, no pet.) (noting that allowing child to live in unsanitary conditions can support finding parent has endangered child's mental and physical well-being). The children suffered from poor hygiene and Julie and Connor neglected the children's medical and developmental needs, which left Jim developmentally delayed with speech and motor-skills and untreated asthma. John also required speech therapy and arrived at his placement not potty-trained and wearing his younger brother's diapers. John and Allen had more than five cavities when they came into the Department's care, and John needed additional crowns and root canals. *See D.H.,* 652 S.W.3d at 60 (explaining that failure to obtain appropriate medical care for child can constitute endangering conduct under subsection (E)). Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Julie and Connor. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *A.C.*, 560 S.W.3d at 630–31. We overrule Julie and Connor's first two issues on appeal.

**Discussion–Matthew**

Matthew argues that there is no evidence to support termination because he was not the reason the Department opened the case. Department investigator Christine Liguez swore in an

24

affidavit that Matthew "stated he didn't want to get involved in a case again and that he has been through this before and got accused of touching [Rose]." Matthew "stated that he did not want his home address listed in any court documents and that he would not feel safe with [Julie] knowing where he lived." Matthew told Liguez that he had not seen Rose in three years and he did not want to participate in any court orders.

When Liguez spoke to Matthew in April 2021, Matthew repeated that he "didn't want to get involved in a case again" and he did not want to participate in any court orders. Matthew stated "his concerns with [Julie] is that she continues to use drugs and have children she can't take care of." Matthew also stated that he was "scared of [Julie]." In May 2021, the trial court appointed the Department as non-emergency temporary managing conservator of Rose and awarded Matthew supervised visitation with Rose. Rose was placed with Sam and given an opt-out provision regarding visits with Matthew.

At trial, Department investigator Liguez testified that Matthew did not want to participate in services because the case did not involve him and he had not seen Rose in three years. Department caseworker Camille Haberman testified that she was concerned about alcohol use and abuse and stated that the Department would need to be assured that Matthew would not drink before or during any visits with Rose. Although Haberman testified that Matthew agreed to this condition, she also testified that Matthew was not willing to participate in any services. Second Guardian ad Litem testified that Rose made an outcry of sexual abuse against Matthew during the Department's second case in 2017. She stated that, to the best of her knowledge, the Department investigated the claim and ruled out the allegation.

Matthew contends that no evidence was presented that he engaged in acts that jeopardized the physical or emotional well-being of Rose. The record undermines Matthew's

25

argument that he could not have contributed to the issues in the household or known that Rose was endangered. Matthew was aware of all three Department investigations and knew that the Department previously removed Rose, Sam, and Julie's other children from the household. In the present case, Matthew admitted to the Department that he knew that Julie used drugs and neglected to care for her children.[23] *See Jordan v. Dossey*, 325 S.W.3d 700, 721–22, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (stating that child is endangered when environment creates potential for danger which parent is aware of but disregards). Thus, a factfinder could reasonably infer that Matthew was aware of Julie's drug use and other risk factors. *See In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (explaining that one parent's drug-related endangerment of child may be imputed to other parent so long as parent had knowledge of drug use). The trial court could have reasonably inferred that Matthew's unwillingness to participate in the case and his wholesale absence from Rose's life were destabilizing and therefore relevant to an endangerment finding. *See R.A.G.*, 545 S.W.3d at 652 (explaining that factfinder can infer parent's lack of contact with child and absence from child's life endangered child's well-being). The trial court could have attributed Rose's depression, hospitalization, and extended absence from school to the parenting void in her life and Mathew's inability or unwillingness to safeguard Rose's physical and emotional well-being. Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Mathew. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *A.C.*, 560 S.W.3d at 630–31. We thus overrule Matthew's challenge on appeal to the trial court's endangerment findings toward him.

---

[23] Matthew does not contest that the record supports the finding by the trial court that the the condition or surroundings in which Rose remained endangered her physical and emotional well-being.

26

**Best Interest**

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling and evidence on each factor is not required. *See C.H.*, 89 S.W.3d at 27–28. Moreover, "a parent's statutorily offensive conduct is often intertwined with the best-interest determination, and the same evidence may be probative of both issues." *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 400 (Tex. App.—Austin 2020, no pet.).

**Discussion-Julie and Connor**

Turning first to the children's emotional and physical needs, it is well settled that stability and permanence are paramount considerations in evaluating the needs of a child. *See In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The trial court could have rationally based its best-interest finding on evidence that Julie and Connor had a lengthy history with the Department that continued after they engaged in services aimed at resolving parenting problems, Julie and Connor had insufficiently provided for their children's

27

needs but Paternal Grandparents, Sam, and Foster Parents met the children's needs, and Paternal Grandparents and Foster Parents wanted to provide a permanent and stable home by adopting John, Allen, and Jim. *See Holley*, 544 S.W.2d at 371–72. Rose's needs were also met in her placement with Sam, Rose wanted no contact with Julie, and Julie did not request for Rose to be returned to her care. Jim did not want physical contact with his parents during visits and Julie and Connor requested that many parent-child visits be cut short.

The children suffered from health and hygiene issues when they lived with Julie and Connor. John and Allen required extensive dental care and speech therapy. Rose did not attend school, and she was hospitalized and diagnosed with depression after living with Julie and Connor. Jim was delayed in motor skills and language development, and he suffered from asthma that was never diagnosed or treated. Julie and Connor had no formalized plan to address the children's medical, psychological, and developmental needs.

Addressing the parental needs of the individuals seeking custody, neither Julie or Connor could identify what health care providers would address their sons' needs or what insurance plans would cover the children, aside from stating that Julie could add her children to her insurance plan at work. Julie and Connor could not identify the specific school or daycare the children would attend. The record reflects that Connor suffers from untreated mental illness, he broke into Julie's home, and he engaged in a violent criminal act in front of the children for which he showed no remorse. Both Julie and Connor engaged in drug use and parented while under the influence of drugs, which jeopardized the well-being of their children. Julie and Connor thus demonstrated that they could not provide a safe home. *See id.* Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the trial court's best-interest findings against Julie and Connor. *See* Tex. Fam. Code

28

§ 161.001(b)(2); *A.C.*, 560 S.W.3d at 630–31.  We thus overrule Julie and Connor's third issue on appeal.

**Best Interest-Matthew**

The considerations supporting the trial court's endangerment finding support the trial court's finding that termination of Matthew's parental rights to Rose was in Rose's best interest.  Far from demonstrating stability, Matthew has been absent from Rose's life for three years and he did not want to participate in services for this case.  *See J.D.*, 436 S.W.3d at 120 (explaining that stability and permanence are paramount considerations in evaluating child's needs).  Matthew did not present a plan to address Rose's medical, emotional, or educational needs.

The trial court could have rationally based its best-interest finding on Rose's desire not to return to Matthew's care, Matthew's history with the Department, evidence that Matthew did not provide for Rose's needs, evidence establishing a lack of any relationship between Matthew and Rose, evidence that Rose had a positive relationship with Sam, and the recommendation from the attorney ad litem.  *See Holley,* 544 S.W.2d at 371–72.  Matthew did not provide a viable excuse for declining to become involved in the case if he wished to preserve his parental rights.  *See R.A.G.*, 545 S.W.3d at 654.  Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the trial court's best-interest findings against Matthew.  *See* Tex. Fam. Code § 161.001(b)(2); *A.C.*, 560 S.W.3d at 630–31.  We thus overrule Matthew's challenge on appeal to the trial court's best interest finding.

**Julie and Connor-Additional Issues**

Julie argues that the statements that Rose provided during her in-camera interview cannot form the basis for an endangerment finding, but acknowledges that information gleaned from the interview may form the basis for a best-interest finding.  The trial court conducted an in-

29

camera interview with Rose. *See* Tex. Fam. Code § 153.009(b) (providing that trial court may interview child in chambers to determine child's wishes to possession, access, or other issue in suit affecting parent-child relationship). However, because Julie does not allege a specific endangerment or best-interest finding that the trial court purportedly based solely on Rose's in-camera interview or identify a specific statement that Rose provided during the in-camera interview that allegedly formed an endangerment or best-interest finding, she has not presented a claim of error. *See In re A.C.*, 387 S.W.3d 673, 677 (Tex. App.—Texarkana 2012, pet. denied) (explaining that information obtained by trial court during interview is supplemental to evidence taken in court and does not diminish discretion of court in determining best interests of child). Our analysis of Julie's prior issues concluded that the evidence was legally and factually sufficient to support the trial court's endangerment and best-interest findings without considering statements that Rose made during the in-camera interview. We thus overrule Julie's fourth issue on appeal.

In her final issue, Julie argues that the termination of parental rights to Rose was not supported by live pleadings because the Department abandoned its pleading.[24] A trial court's final order must be supported by pleadings. *See* Tex. R. Civ. P. 301; *Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 812–13 (Tex. 1983). In October 2022, Intervenors filed a first amended petition that named Rose, John, Allen, and Jim, as the children, and Matthew, Connor, and Julie as the parents, and requested termination of the parent-child relationship between the biological parents and the children. No party objected to the pleading. The attorney ad litem for Rose filed an original answer that requested the trial court grant any appropriate orders in the interest of the

---

[24] At trial, the Department stated that it was not "going for termination" because "[t]here are other parties going for termination on this case" and "it would make more sense for those parties to be the petitioner."

child, and the attorney ad litem requested termination of Julie's parental rights to Rose at trial. The trial court's docket entry dated November 6, 2022, included the following notation:

> virtual docket call. this is a multi-party termination case where DFPS is no longer seeking term but AAL and Intervenors are. case assigned to Judge Soifer for in person jury trial on Nov. 14th. however, later in the day, parties waived jury trial and Judge Soifer will be trying this case now as bench trial. ACM.

The trial court also confirmed during proceedings on November 14, 2022, that the attorneys ad litem and Intervenors were asking that all parents' rights be terminated. We conclude that Julie has not demonstrated that the trial court's order terminating parental rights was not supported by the pleadings. We overrule Julie's final issue on appeal.

## CONCLUSION

Having overruled all of Julie, Connor, and Matthew's issues on appeal, we affirm the trial court's decree of termination.

_____

Edward Smith, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed: February 14, 2024